EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------- x

UNITED STATES OF AMERICA

                                                                                       17 Cr. 155 (DLI)

                    -against-

MICHAEL PALMACCIO,

                                  Defendant.

------------------------------------------------------------------------- x


**MOTION FOR A SENTENCE REDUCTION
PURSUANT TO 18 U.S.C. § 3582**


                                      MICHAEL HUESTON, ESQ.
                                      *Attorney for Defendant Michael Palmaccio*
                                      16 Court Street, Suite 1800
                                      Brooklyn, New York 11241
                                      (718) 246-2900


Dated:       Brooklyn, New York
                 August 31, 2020

I.      **Preliminary Statement**

Michael Palmaccio respectfully moves this Court, pursuant to 18 U.S.C. § 3582(c)(1)(A), to modify his 84 months sentence of incarceration to time served, followed by a period of supervised release, due to the extraordinary health risk posed to him as a sufferer of Rheumatoid Arthritis in the time of the COVID-19 pandemic.

On March 19, 2018, Mr. Palmaccio pled guilty to Count One of the superseding indictment.[1] At Mr. Palmaccio's November 20, 2018 sentencing, the Court determined that his Guideline range was 70 to 87 months, based on a total offense level of 25 and a Criminal History Category of III, and sentenced him to 84 months of incarceration and other penalties.[2] At that time, we argued for a variance from the Guidelines because of Mr. Palmaccio's Rheumatoid Arthritis; and while the Court acknowledged his disability, it denied the request.[3]

Mr. Palmaccio has been in federal custody since his arrest on March 28, 2017.[4] He is incarcerated at FCI Terre Haute Federal Correctional Institution ("FCI Terre Haute"); his current release date is March 15, 2023; so he has approximately 30 months left in his sentence.[5] On or about April 27, 2020, Mr. Palmaccio submitted his *pro se* request for compassionate release to the officials at Terra Haute, citing among other

---

[1] *See* Presentence Investigation Report ("PSR") at ¶ 1; and March 19, 2018 Minute Entry.

[2] *See* portions of November 20, 2018 Sentencing Transcript attached hereto at Exhibit A; November 20, 2018 Minute Entry; and Judgment of Conviction, Doc. 475.

[3] *See* November 20, 2018 Sentencing Transcript at p. 45 attached hereto at Exhibit A.

[4] *See* March 28, 2017 Minute Entry.

[5] *See* Federal Bureau of Prisons ("BOP"), Find An Inmate, https://www.bop.gov/inmateloc/.

things, his vulnerability to COVID-19 due to his Rheumatoid Arthritis.[6] He never received a response. Rather, a counselor told Mr. Palmaccio that he should have applied for a "reduction in sentence", not for "compassionate release". On August 6, 2020, I emailed FCI Terre Haute, asking for any information regarding Mr. Palmaccio's application, and attached the items at Exhibit B. FCI Terre Haute has not replied to my email.

      While incarcerated, Mr. Palmaccio has made substantial efforts at rehabilitation. He has spent his time accumulating work and educational credits and training, including studying for his General Equivalency Diploma.[7] He also maintains strong relationships with his family and friends, who are willing to support and assist him upon his release.[8] Once released Mr. Palmaccio plans on reuniting with his wife and children in New York City, having a much needed knee-replacement surgery, and working hard to support his family. He understands that the crimes he committed were serious. He continues to endeavor to be a positive role model for his children. And we respectfully submit that Mr. Palmaccio's release, under the extraordinary circumstances posed to him by COVID-19, would not diminish the deterrent impact of his sentence, and under 3553(a), his efforts at rehabilitation demonstrate that he is not a danger to the community.

---

[6] *See* Mr. Palmaccio's request for compassionate release attached hereto at Exhibit B.

[7] *See* BOP course certificates and part of his Individual Needs Plan attached hereto at Exhibit C.

[8] *See* Mr. Palmaccio's letter to the Court; letters of support; and petition at *https://www.change.org/p/terre-haute-federal-prison-free-mike-palmaccio-covid-19-early-release/sign*, which 2031 people have signed (last checked August 31, 2020.

**II.     Mr. Palmaccio's Medical Vulnerability Merits His Compassionate Release**

**A.     Legal Framework**

A modification of an imposed term of imprisonment is permitted upon finding: (1) "extraordinary and compelling reasons" warrant a reduction; (2) the reduction is "consistent with applicable policy statements issued by the Sentencing Commission;" and (3) 18 U.S.C. § 3553(a) warrants a reduction. *See* 18 U.S.C. § 3852(c)(1)(A). The applicable policy statement, U.S.S.G. § 1B1.13, sets forth four circumstances that constitute "extraordinary and compelling reasons" to justify a sentence reduction: a defendant's medical condition, age, family circumstances, and other reasons. *See* U.S.S.G. § 1B1.13, cmt. n.1.

While courts have held that they are no longer bound by the Guidelines' definition of "extraordinary and compelling circumstances" because §1B1.13 predates passage of the Fair Sentencing Act, *see, e.g.*, *United States v. Millan*, No. 91-CR-685 (LAP), 2020 U.S. Dist. LEXIS 59955, at * 22-23 (S.D.N.Y. Apr. 6, 2020) (discussing courts' "newfound authority" under the FSA "to reduce sentences based on 'extraordinary and compelling reasons' (even if those reasons do not relate to [factors enumerated in U.S.S.G. § 1B1.13])"), among the grounds enumerated by the Commission as sufficient to satisfy the statute is when a defendant is "suffering from a serious physical or medical condition . . . that substantially diminishes [his] ability . . . to provide self-care within the environment of a correctional facility[.]" U.S.S.G. §1B1.13, cmt (1)(A)(ii)(I). In deciding a compassionate release petition, the court is advised also to consider whether releasing the defendant would risk "danger to the safety of any other person or to the community," U.S.S.G. § 1B1.13 (3), and to balance "the [sentencing]

3

factors set forth in section 3553(a) to the extent that they are applicable." *Id.* (quoting 18 U.S.C. § 3582(c)(1)(A)).

Upon a motion for compassionate release filed by a defendant, a court may modify its sentence "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *See* 18 U.S.C. § 3582(c)(1)(A). This provision is not jurisdictional and may be waived. *See, e.g., United States v. Haney*, No. 19 Cr. 541 (JSR), Dkt. No. 27, 2020 U.S. Dist. LEXIS 63971 (S.D.N.Y. Apr. 13, 2020); and *United States v. Sawicz*, No. 08 Cr. 287 (ARR), 2020 WL 1815851 (E.D.N.Y. Apr. 10, 2020).

Exhaustion and waiver, here, are not issues because more than 30 days have lapsed since Mr. Palmaccio submitted his application for compassionate release to the facility without receiving a response.

### B. Mr. Palmaccio's Health Risk and Conditions of Confinement

Granting compassionate release to Mr. Palmaccio would not be inconsistent with the relevant sentencing factors set forth in 18 U.S.C. § 3553(a). As we discussed at sentencing, Mr. Palmaccio has suffered from Rheumatoid Arthritis since he was a child, has had both of his hips replaced, and needs both of his knees replaced.[9] The PSR noted Mr. Palmaccio has had over 10 hospitalizations due to Rheumatoid Arthritis, and that he is also awaiting surgeries on both shoulders.[10] As a child, he spent months at a time in

---

[9] *See* Presentence Report ("PSR") at ¶¶ 265, 266; and Defendant's Sentencing Memorandum, Doc. 458, at pp. 9-12 ("In a March 2018 report … it was reported that an orthopedist recommended bilateral knee replacements for Mr. Palmaccio.")

[10] *See* PSR at ¶ 265.

4

the hospital, and wore braces on his legs for support and to aid his proper growth.[11] At the Metropolitan Detention Center he was prescribed Prednisone, Duloxetine, Vitamin D, and acetaminophen to treat his condition.[12] Recent medical records continue to show that the BOP still has not provided Mr. Palmaccio with knee replacement surgery and he continues to receive Prednisone and other medications.[13]

Notably, Rheumatoid Arthritis is an autoimmune disorder that causes one's immune system to attack its own body.[14] The CDC categorizes individuals who suffer from Rheumatoid Arthritis as an immunocompromised people who must be protected from COVID-19 because of their vulnerability.[15] The BOP also lists Rheumatoid Arthritis as an illness to consider in its guidelines for compassionate release for elderly prisoners.[16]

Mr. Palmaccio's poor state of physical health establishes "extraordinary and compelling" reasons warranting his compassionate release. Mr. Palmaccio describes, in

---

[11] *Id.*

[12] *Id.*

[13] *See* attached medical records filed under seal at Exhibit E.

[14] Mayo Clinic, *Rheumatoid Arthritis*, https://www.mayoclinic.org/diseases-conditions/rheumatoid-arthritis/symptoms-causes/syc-20353648; and Centers For Disease Control ("CDC"), *"Rheumatoid Arthritis (RA)"*, https://www.cdc.gov/arthritis/basics/rheumatoid-arthritis.html.

[15] CDC, *If You Are Immunocompromised, Protect Yourself From COVID-19*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/immunocompromised.html ("Common medical conditions that are sometimes treated with immunosuppressants include Rheumatoid arthritis…."); and CDC, *People of Any Age with Underlying Medical Conditions, Immunocompromised State (Weakened Immune System) From Blood or Bone Marrow Transplant, Immune Deficiencies, HIV, Use of Corticosteroids, or Use of Other Immune Weakening Medicines*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html#immunocompromised-state.

[16] BOP *Compassionate Release Criteria for Elderly Inmates with Medical Conditions*, at p. 2, https://www.bop.gov/resources/pdfs/2019_compassionate_release_cpg.pdf.

his letter to the Court, the true hardship he has suffered from at FCI Terre Haute because of his disability, stating how his knees have deteriorated to the point that walking on stairs and standing are "hard to do", that some days the pain is "unbearable", and how he is afraid of contracting COVID-19 since given he is an immunocompromised person. This totality shows Mr. Palmaccio's diminished ability "to provide self-care within the environment of a correctional facility."  *See* U.S.S.G. §1B1.13, cmt (1)(A)(ii)(I).

During the COVID-19 pandemic, district judges have acknowledged that: "[a]n individual suffering from rheumatoid arthritis may be especially vulnerable to COVID-19 both because the condition reflects a malfunction of the immune system and because the medication used to treat it has the effect of suppressing the body's natural immune response."  *See, e.g.*, *United States v. McDuffie*, No. 19-CR-212 (VEC), 2020 U.S. Dist. LEXIS 59594, at *4 (S.D.N.Y. Apr. 3, 2020); *United States v. Canale*, No. 17-CR-286 (JPO), 2020 U.S. Dist. LEXIS 62679, at *3 (S.D.N.Y. Apr. 9, 2020) ("And rheumatoid arthritis is an autoimmune disorder, which "carr[ies] a documented increased risk of infection compared with the general population.") (internal citation omitted).

Further, COVID-19, itself, presents an extraordinary and unprecedented threat to incarcerated people.  This is a consequence of how inmates are housed, the general lack of hygiene and quality medical care, and overcrowding.[17]  There is "an urgent priority to

---

[17]*See, e.g.*, Timothy Williams et al., *Jails Are Petri Dishes: Inmates Freed As The Virus Spreads Behind Bars, N.Y. Times* (Mar. 30, 2020), https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html ("The coronavirus is spreading quickly in America's jails and prisons, where social distancing is impossible. … Practices urged elsewhere to slow the spread of the virus –avoiding crowds, frequent handwashing, disinfecting clothing – are nearly impossible to carry out inside."); *Remick v. City of Philadelphia*, No. 20 Civ. 1959, Doc. 1, Exhibit A (E. D. Pa. Apr. 20, 2020) (Declaration of Joseph J. Amon, Ph.D., MSPH, Director of Global Health and Clinical Professor of Community Health and Prevention at the Drexel Dornsife School of Public Health, at 5); Joseph A. Bick, *Infection Control In Jails And Prisons,* Clinical Infectious Diseases, Healthcare Epidemiology, Oct. 15, 2007) at pp. 1047-55 and https://academic.oup.com/cid/article/45/8/1047/344842 (noting that in prison facilities, "[t]he probability of transmission of potentially pathogenic organisms is increased by crowding, delays in medical evaluation

reduce the number of people in detention facilities during this national public health emergency in order to limit exposure to COVID-19."[18] Mass testing of several states' prison systems revealed that COVID-19 infections were widespread with the majority of inmates who tested positive being asymptomatic.[19] One can reasonably infer this pattern applies to other prison systems, such as the BOP.

A joint letter issued by District Attorney's offices across the country argued that because prisons can "become breeding grounds for the coronavirus," it is crucial to "work together to implement concrete steps in the near-term to dramatically reduce the number of incarcerated individuals and the threat of disastrous outbreaks."[20] On the federal level, United States Attorney General William Barr has ordered the BOP to "prioritize the use of . . . various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic,"[21] and later directed the agency to intensify efforts to "immediately review" and release "vulnerable inmates."[22]

---

and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise….").

[18] *See Public Health Expert Letter to Trump*, The Justice Collaborative (Mar. 27, 2020), https://thejusticecollaborative.com/wp-content/uploads/2020/03/Public-Health-Expert-Letter-to-Trump.pdf (letter from public health experts to President Trump requesting that the President commute the sentences "for all persons who have one year or less remaining on their sentence" and further observing that incarcerated individuals are "housed cheek-by-jowl, in tightly-packed and poorly-ventilated dormitories; they share toilets, showers, and sinks; they wash their bedsheets and clothes infrequently; and often lack access to basic personal hygiene items. These facilities . . . are tinderboxes, ready to explode and endanger our entire country. Adequate medical care is hard to provide, even without COVID-19.")

[19] *See, e.g.,* Linda So, et al*., In Four U.S. State Prisons, Nearly 3,300 Inmates Test Positive For Coronavirus—96% Without Symptoms*, Reuters (Apr. 25, 2020), https://www.reuters.com/article/us-health-coronavirus-prisons-testing-in/in-four-u-s-state-prisons-nearly-3300-inmates-test-positive-for-coronavirus-96-without-symptoms-idUSKCN2270RX.

[20] *See Joint Statement from Elected Prosecutors on Covid-19 and Addressing the Rights and Needs of Those in Custody* (Mar. 25, 2020), https://fairandjustprosecution.org/wp-content/uploads/2020/03/Coronavirus-Sign-On-Letter.pdf.

[21] *See Memorandum from the Attorney General to the Director of the Bureau of Prisons re: Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic* (Mar. 26, 2020),

Notwithstanding the above, the BOP has to date moved too slowly in releasing those who can be released consistent with public safety. As of late April 2020, the nonprofit media organization The Marshall Project reported that the number of people permitted to serve the remainder of their sentences in home confinement had gone up by only 1,027 following the issuance of Attorney General Barr's guidance, or half of one percent of the federal prison population.[23]

The virus continues to infiltrate BOP facilities, including at FCI Terre Haute. The BOP's COVID-19 website currently states that at FCI Terre Haute 230 tests of inmates have been completed, while another 23 are pending, with 48 positive tests.[24] Mr. Palmaccio has not been tested for COVID-19. Because it takes only a few cases for the virus to take hold and spread exponentially within a prison setting, courts have recognized that defendants face an enhanced risk of contracting the virus, even in the absence of reported cases at the particular facility. *See, e.g., United States v. Asaro*, No. 17-cr-127 (ARR), 2020 U.S. Dist. LEXIS 68044, at *18 (E.D.N.Y. Apr. 17, 2020) (granting compassionate release because although "as of this writing, no confirmed cases of COVID-19 are present at Springfield [prison where defendant was housed], I cannot conclude that no cases are, in fact, present, without assurances that the BOP is routinely testing everyone within the facility.").

---

https://www.politico.com/f/?id=00000171-1826-d4a1-ad77-fda671420000.

[22]*Id.*

[23]*See* Joseph Neff et al., *Few Federal Prisoners Released Under COVID-19 Emergency Policies*, The Marshall Project (Apr. 25, 2020), https://www.themarshallproject.org/2020/04/25/few-federal-prisoners-released-under-covid-19-emergency-policies.

[24]*See* BOP**,** Covid-19 Inmate Test Information, https://www.bop.gov/coronavirus/ (last checked august 31, 2020).

8

Moreover, the Terre Haute Federal Correctional Complex, of which FCI Terre Haute is apart, has been criticized for not following CDC guidelines and keeping inmates insulated from potential COVID-19 exposure. A recent article described the Complex this way:

> Inmates are still being moved in and out of the facility. Union leaders, representing the officers working inside the Terre Haute facilities, raised concerns about that fact back in March. At that time, they also said there were only four COVID-19 test kits for nearly 3,000 inmates.
>
> During our March 2020 interview AFGE Local 720 President Kenny Swick said, "It's very confined spaces, very confined areas and when we get sickness that comes in, it goes through this place like wildfire."
>
> \*   \*   \*
>
> Mike [an inmate other than Mr. Palmaccio] says testing is just part of the problem. He says regular cleaning and disinfecting is the other half. Even though the BOP says it is following CDC guidelines, Mike says that translates to only two bleach disinfecting wipes a week.
>
> "It's just a joke. It's just a way to say yeah, we've provided the inmates with sanitation wipes."
>
> Other inmates are expressing the same concerns about the lack of testing and resources. In a letter to News 10, an inmate still serving time inside the prison describes a lack of access to hand sanitizer, staff not wearing masks or gloves, and people in close proximity during inmate counts.[25]

With limited insight into when the pandemic might end, this unprecedented situation makes Mr. Palmaccio more vulnerable to serious illness. Experts estimate that authorities

---

[25]*Inmates Describe Life in Federal Prison in the Age of Coronavirus*, WTNI-TV10, June 11, 2020 https://www.wthitv.com/content/news/Inmates-describe-life-in-federal-prison-in-the-age-of-coronavirus-571194451.html.

9

must prepare for "another 18 to 24 months of significant Covid-19 activity…."[26] As a result, the BOP will most likely continue to implement recurring lockdowns and restrict inmate movement and visitation, or face a likely increase in COVID-19 infections, placing further hardships on disabled inmates like Mr. Palmaccio. *See Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring) (calling for heightened judicial scrutiny of the projected impact of jail and prison conditions on a defendant).

Much is still unknown about the novel infection, including whether a vaccine or effective treatment will become available, or whether infected persons who recover from COVID-19 will develop lasting immunity to the virus. At the time the Court sentenced Mr. Palmaccio, while we argued for a variance based on his having Rheumatoid Arthritis, incarceration posed no dire health risk to him. That has changed. Present circumstances present a serious risk for Mr. Palmaccio and just punishment should not include an unacceptable risk of severe illness or death.

Mr. Palmaccio is rehabilitated and not a danger to the community. Indeed, the release of a qualified individuals such as Mr. Palmaccio is necessary not only to protect him – it will also lower the risks posed to other inmates by increasing their ability to engage in some form of social distancing, and will help protect the health of the staff necessary to ensure the functioning of BOP facilities. As the COVID-19 global crisis continues to unfold, the benefits of keeping Mr. Palmaccio for the remainder of this sentence do not outweigh the potentially grave consequences of denying this motion.

Accordingly, Mr. Palmaccio's risk of serious illness or death due to COVID-19 infection, and the impact of COVID-19 on his conditions of confinement as a disabled inmate

---

[26]Siobhan Roberts, *This is the Future of the Pandemic*, N.Y. Times, May 8, 2020, https://www.nytimes.com/2020/05/08/health/coronavirus-pandemic-curve-scenarios.html.

are "extraordinary compelling reasons" justifying his release. *See, e.g., United States v. Sawicz*, No. 08-cr-287 (ARR), 2020 U.S. Dist. LEXIS 64418 (E.D.N.Y. Apr. 10, 2020) (granting release over government objection to defendant with hypertension at Danbury, waived exhaustion); *United States v. Sedge*, No. 16-cr-537 (KAM), 2020 U.S. Dist. LEXIS 85540 (E.D.N.Y. May 13, 2020) (granting release to 52-year old defendant with hypertension and coronary artery disease at Danbury with 8 months remaining on drug offense sentence); *United States v. Copeland*, No. 03-cr-01120 (FB), 2020 U.S. Dist. LEXIS 87983 (E.D.N.Y. May 19, 2020) (granting release, over government objection, to 67 year old defendant with 4 years left on sentence, who has medical conditions rendering him among those most vulnerable to the severe symptoms and adverse outcomes of COVID-19); *United States v. Mapp*, No. 95-cr-01162 (FB), 2020 U.S. Dist. LEXIS 109107 (E.D.N.Y. June 19, 2020) (granting release, over government objection, to 56 year old defendant with 6 years left on sentence, who has medical vulnerabilities to COVID-19 and due to his rehabilitation); and *United States v. Kissi*, No. 13-CR-51 (MKB), 2020 U.S. Dist. LEXIS 118956 (E.D.N.Y. June 26, 2020) (granting release, over government objection, and waiving exhaustion, to defendant due to combination of elevated risk of COVID-19 complications, changes in the safety valve provisions, the undue length of his sentence, and the conditions of his confinement).

### III. Conclusion

For the reasons stated, Mr. Palmaccio respectfully request that the Court grant his motion for compassionate release under 18 U.S.C. 3582(c)(1)(A).

Dated:      Brooklyn, New York
              August 31, 2020

                                   Respectfully submitted,
                                   ____/s/_____
                                   MICHAEL HUESTON, ESQ.
                                   *Attorney for Defendant Michael Palmaccio*
                                   16 Court Street, Suite 1800
                                   Brooklyn, New York 11241
                                   (718) 246-2900